Lawrence S. Lustberg, Esq.
Brittany Thomas, Esq.
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102
(973) 596-4500
llustberg@gibbonslaw.com
bthomas@gibbonslaw.com

*Attorneys for Plaintiff John Doe*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN DOE, a pseudonym,<br><br>        Plaintiff,<br><br>        v.<br><br>Officer LARRICK McELROY; Sergeant DEVOUGHN MOORE; Officer GUSTAVO FRANCA; Officer ERIC PEREZ; Officer MICHAEL CASTILLO; Lieutenant JAMES RUSSO; Former Commissioner MARCUS HICKS; and Administrator PATRICK NOGAN,<br><br>        Defendants. | No.  21 Civ. 17956<br><br>**COMPLAINT<br>AND DEMAND<br>FOR JURY TRIAL** |

Plaintiff John Doe, by and through his attorneys, Gibbons P.C., for his Complaint alleges as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff  John Doe[1] brings this civil rights lawsuit seeking damages for the abuse that he suffered while imprisoned at Northern State Prison, a facility maintained by the New Jersey Department of Corrections ("DOC").  John Doe is a gay man who was imprisoned by DOC for

---

[1] Plaintiff's Motion to Proceed Pseudonymously is forthcoming.

three years; he alleges that while at Northern State, he was treated differently from other prisoners solely because he is gay. Specifically, Mr. Doe was drugged and sexually assaulted by a prison guard; pressured not to report the sexual assault by prison investigative staff; subjected to harassment based upon his sexual orientation; and then assaulted and placed in administrative segregation, in conditions of solitary confinement in retaliation for having reported the sexual assault.

2.      In particular, Defendant Officer Larrick McElroy sexually assaulted Mr. Doe on October 2, 2019.  That morning, Defendant McElroy removed Mr. Doe from the Medication-Assisted Treatment ("MAT") line and forced him into a bathroom in the gym, which was an off-camera area, *i.e.* out of range of the prison's security cameras. There, Defendant McElroy made Mr. Doe swallow a pill, and then he forced Mr. Doe to perform oral sex on him.

3.      After the assault, Mr. Doe was returned to the MAT line, and soon thereafter to his unit. In his unit, he had a medical episode resulting from the pill he was forced to take and immediately requested medical assistance.  Prison staff moved Mr. Doe to the infirmary for treatment.  While there, he reported the sexual assault to a medical staff member.

4.      Thereafter, two members of the DOC's Special Investigations Division ("SID") visited Mr. Doe in the infirmary.  Rather than taking an accurate report of the events, the SID investigators berated Mr. Doe with homophobic slurs and threats and ultimately coerced Mr. Doe to give a recorded statement denying that Defendant McElroy had assaulted him, in exchange for which Mr. Doe was promised that he would not face prison disciplinary charges for being intoxicated and would be moved to a LGBTQ-friendly housing unit.

5.      In fact, the DOC did proceed with disciplinary charges.  On October 4, DOC officers arrived at the infirmary to transfer Mr. Doe to administrative segregation pending a hearing

on his disciplinary charges.  During the transfer, Mr. Doe requested the opportunity to speak with SID to report the sexual assault.  In response, Defendants Sergeant Devoughn Moore, Officer Gustavo Franca, Officer Eric Perez, and Officer Michael Castillo physically assaulted Mr. Doe, resulting in significant injuries including two black eyes, numerous cuts and bruises, "road rash" from being dragged across the floor, and a sprained wrist.  These Defendants also used homophobic slurs against Mr. Doe during the assault.

6.      In addition to these physical injuries, these assaults have caused Mr. Doe to suffer from significant psychological trauma.  Mr. Doe has been diagnosed with Major Depressive Disorder and suffers from flashbacks and nightmares.  Mr. Doe's traumatic reaction is also triggered by otherwise ordinary events—for example, when he hears the sound of keys jangling on a keychain, which is a common drumbeat in the prison setting where guards carry numerous keys, Mr. Doe suffers flashbacks and anxiety to the events described in this Complaint.

7.      The sexual and physical assaults that Mr. Doe suffered at the hands of DOC employees is not an outlier.  Rather, there are numerous examples of DOC staff sexually and physically assaulting prisoners, whom the DOC is charged with protecting from harm.  And the evidence is also clear that DOC has, for years, failed to train and supervise DOC employees in a manner that would prevent these tragic harms from occurring. Therefore, Defendants Former Commissioner Marcus Hicks and Administrator Patrick Nogan, who were the ultimate authorities in charge of Mr. Doe's care at the time he was assaulted, are also liable for the harms he suffered.

8.      Accordingly, Mr. Doe brings this case alleging violations of his civil rights and seeking compensatory and punitive damages, as well as all other relief as the Court deems just and proper.

## THE PARTIES

9.      Plaintiff John Doe is a citizen of the United States and at all relevant times was a resident of New Jersey.

10.     Defendant Officer Larrick McElroy was, at all times relevant to this Complaint, an employee of the DOC, stationed at Northern State Prison, and was acting within the scope of said employment and under color of state law.  Upon information and belief, Defendant McElroy is currently facing disciplinary proceedings in the Office of Administrative Law, in which the DOC is seeking to terminate his employment.

11.     Defendant Sergeant Devoughn Moore was, at all times relevant to this Complaint, an employee of the DOC, stationed at Northern State Prison, and was acting within the scope of said employment and under color of state law.

12.     Defendant Officer Gustavo Franca was, at all times relevant to this Complaint, an employee of the DOC, stationed at Northern State Prison, and was acting within the scope of said employment and under color of state law.

13.     Defendant Officer Eric Perez was, at all times relevant to this Complaint, an employee of the DOC, stationed at Northern State Prison, and was acting within the scope of said employment and under color of state law.

14.     Defendant Officer Michael Castillo was, at all times relevant to this Complaint, an employee of the DOC, stationed at Northern State Prison, and was acting within the scope of said employment and under color of state law.

15.     Defendant Lieutenant James Russo was, at all times relevant to this Complaint, an employee of the DOC, stationed at Northern State Prison, and was acting within the scope of said employment and under color of state law.

16.     Defendant former Commissioner Marcus Hicks was, at all times relevant to this Complaint, the New Jersey Commissioner of Corrections.[2]  By law, Defendant Hicks was the head and chief executive officer of the DOC, N.J.S.A. 30:1B-4, and, among other responsibilities, was charged with "[a]dministering the work of the [DOC]," and for "[f]ormulat[ing], adopt[ing], issu[ing] and promulgat[ing] . . . such rules and regulations for" the DOC, including "its officers and employees."

17.     Defendant Patrick Nogan was, at all times relevant to this Complaint, the Administrator of Northern State Prison.  Upon information and belief, Defendant Nogan was in charge of the daily operations of Northern State Prison, including, but not limited to, supervision of staff and implementation of policies and procedures regarding treatment of prisoners.  At all relevant times, Defendant Nogan was acting in the scope of his employment, under color of state law, and in his individual and official capacities.

## JURISDICTION AND VENUE

18.     This action arises under the First, Eighth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and New Jersey state law.

19.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331 and 1367(a).

20.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to this action occurred in Essex County, New Jersey, within the United States District Court for the District of New Jersey.

---

[2] Former Commissioner Hicks resigned his from position on June 8, 2021, after facing extensive criticism regarding lack of oversight of the Edna Mahan Correctional Facility for Women, where numerous correctional officers have been accused of physical assaults.  *See, e.g.*, Matt Arco & Blake Nelson, *Top N.J. prison official quits after widespread abuse exposed*, NJ ADVANCE MEDIA, June 8, 2021, https://www.nj.com/politics/2021/06/nj-corrections-commissioner-is-out-after-damning-report-on-abuse-at-state-womens-prison.html.  The current Acting Commissioner of Corrections is Victoria Kuhn, Esq.

## FACTUAL ALLEGATIONS

**A.     Plaintiff is Sexually Assaulted by Defendant McElroy.**

21.     Mr. Doe is 31-year-old gay man who resides in New Jersey.  He is a recovering drug addict who began using drugs as a child with his mother who was addicted to drugs his entire childhood.  Mr. Doe's father and brother also have a history of drug abuse and Mr. Doe's mother and brother both died of drug overdoses.

22.     Due to his unsafe home environment, the State of Maryland assumed the custody of Mr. Doe when he was in elementary school. For the remainder of Mr. Doe's childhood, he bounced around the foster care system. By the time he aged out of the system he had stayed in at least a dozen different foster homes or facilities.

23.     During his childhood, Mr. Doe knew that he was different from others and realized at a young age that he was gay. While Mr. Doe has been open about his sexual orientation, he has struggled to deal with the harassment he experienced from others, which included both verbal and physical assaults, as a result of his orientation. Mr. Doe used drugs, at least in part, to cope with the effects of this harassment and the loss of both his mother and brother.

24.     In 2017 Mr. Doe pleaded guilty to a drug-related charge and was subsequently imprisoned by DOC.  Mr. Doe was imprisoned at South Woods State Prison from approximately December 18, 2017 until October 1, 2018 at which point he was transferred to Northern State Prison, a correctional institution located in Newark, New Jersey. Mr. Doe was imprisoned at Northern State Prison until November 1, 2019 at which point he was transferred to New Jersey State Prison's administrative segregation unit until November 4, 2020.[3]

---

[3] Mr. Doe was one of over two thousand New Jersey state prisoners released that day as a result of the implementation of a statute providing credits for persons imprisoned during the COVID-19 public health emergency.  *See* Blake Nelson & Joe Atmonavage, *N.J. is set to release thousands*

25.     On October 2, 2019,  at approximately 8:00 a.m., Mr. Doe was waiting in the line for MAT, a joint program administered by the DOC and the New Jersey Department of Human Services to provide treatment to individuals suffering from opioid addictions.  While Mr. Doe was waiting in the MAT line, he observed Defendant McElroy, known to him as "CO Mac."  Defendant McElroy came out of the gym through a side door and walked away.  He returned about ten minutes later carrying a plate of food and two cups.

26.     At that time, Defendant McElroy spoke to Mr. Doe briefly.  In the days leading up to this encounter, Defendant McElroy had been speaking to Mr. Doe about taking a job in the gym. Indeed, Defendant McElroy had been telling Mr. Doe that he knew how other prison staff and prisoners perceived Mr. Doe because of his sexual orientation and attempted to assure Mr. Doe that he would be safe working with him in the gym.

27.     Following the brief discussion, Defendant McElroy left, then reentered the gym through the side door.  He left the door open when he entered the gym, which was unusual; in Mr. Doe's experience, corrections officers were diligent about closing doors behind them, for security reasons.

28.     A few minutes later, while Mr. Doe was still in the MAT line, another prisoner told Mr. Doe that Defendant McElroy was calling for Mr. Doe to enter the gym.  Mr. Doe  was required to obey any instructions from a corrections officer; thus, he complied and entered the gym through the side door, which Defendant McElroy had left open.

---

*of inmates from prison early across the state throughout the day*, N.J. ADVANCE MEDIA, Nov. 4, 2020,     https://www.nj.com/news/2020/11/nj-expected-today-to-release-thousands-of-prisoners-early-statewide.html.

29.     The gym was empty, except for Defendant McElroy, who was in the officer's "bubble."  The bubble is a control room where officers can securely monitor the gym, including through security cameras; control opening and closing of doors; and communicate with other correctional staff.  Notwithstanding the fact that access to the bubble is restricted to correctional staff, Defendant McElroy instructed  Mr. Doe to enter into the bubble. By this time, Mr. Doe had been imprisoned for nearly two years and had seen the consequences of disobeying a instructions from prison staff, namely that prison guards use physical violence as a tool to enforce rules.

30.     Defendant McElroy spoke to Mr. Doe for approximately a minute inside the bubble, and then exited the bubble and went into a bathroom.  He then returned to the bubble, again spoke to Mr. Doe briefly, and then left again, going to the area outside the bathroom door and telling Mr. Doe that it was "off-camera."

31.     Defendant McElroy called Mr. Doe to the area, and then instructed Mr. Doe to enter the bathroom.  Mr. Doe felt like he had no choice but to comply; thus, he went inside, and Defendant McElroy followed.

32.     After Defendant McElroy made Mr. Doe enter the bathroom, he gave Mr. Doe a pill and ordered him to take it.  Mr. Doe refused because at this time he had been clean for 34 months and did not want to jeopardize his sobriety.  But Defendant McElroy commanded Mr. Doe to ingest the pill. Mr. Doe eventually complied. Thereafter, Defendant McElroy pointed to his groin and verbally instructed Mr. Doe to perform oral sex.

33.     In that moment,  Mr. Doe feared for his life should he try to escape and felt unable to leave the bathroom. In addition to the fear of retaliation he felt should be try to escape, Mr. Doe was conscious of the power Defendant McElroy had over him in that bathroom. Mr. Doe  was trapped inside the bathroom, an off-camera area, with Defendant McElroy, a corrections officer

who wielded extensive power over him. Accordingly, Mr. Doe, complied with Defendant McElroy's command.

34.     Mr. Doe performed oral sex on Defendant McElroy for approximately two minutes, at the end of which Defendant McElroy ejaculated inside of Mr. Doe's mouth.

35.     Fearful, stunned and ashamed, Mr. Doe left the bathroom, exited the gym, and rejoined the MAT line.  He obtained his medication and quickly returned to his unit, where he immediately took a shower.

36.     Approximately two hours after Defendant McElroy drugged and assaulted Mr. Doe, Mr. Doe began to suffer from the effects of the pill. He felt high and like he was "tripping."  Mr. Doe immediately informed a prison staff member of his condition.  Medical staff arrived and transported him to the infirmary.

37.     While in the infirmary, medical staff conducted a test of Mr. Doe's urine, which indicated that Defendant McElroy had forced Mr. Doe to take methamphetamines.  Mr. Doe was served with disciplinary charges for being intoxicated.

38.      The next day, on October 3, Mr. Doe was  evaluated by a prison psychiatric employee, at which time Mr. Doe made a verbal Prison Rape Elimination Act (PREA) complaint.[4] Mr. Doe informed  the employee that Defendant McElroy had drugged him with what he had just learned was methamphetamines and then forced him to perform oral sex. This employee never documented Mr. Doe's PREA complaint.

---

[4] *See* 34 U.S.C. § 30301 *et seq.; see also* 28 C.F.R. § 115.51 ("[Prison] [s]taff shall accept reports [of sexual abuse] made verbally, in writing, anonymously, and from third parties and shall promptly document any verbal reports.")

**B.      Staff from the Special Investigations Division Coerces Plaintiff Into a False Recantation.**

39.      Later on October 3, after Mr. Doe reported the sexual assault to medical staff, two officers from the DOC Special Investigations Division (SID) visited Mr. Doe, at which time Mr. Doe again made a verbal PREA complaint.  Mr. Doe informed the SID officers that Defendant McElroy had drugged him with methamphetamines and then forced him to perform oral sex.

40.      In response to Mr. Doe's complaint, one of the SID officers indicated that "CO Mac" was his buddy. The SID officers made numerous homophobic jokes toward Mr. Doe.

41.      For nearly thirty minutes the SID officers spoke to Mr. Doe off-camera, and told him that if he just "forgot" about the sexual assault, they would make sure that his disciplinary charges for the intoxication were dropped.  It would be, the SID officers said, as if "nothing ever happened." They even asked Mr. Doe what he would want in exchange for his recantation.

42.      When their initial attempts to coerce Mr. Doe to withdraw his complaint failed, the SID officers threatened Mr. Doe with administrative segregation should he fail to "forget" what Defendant McElroy forced him to do. They told Mr. Doe that his complaint would be "major" and insinuated that if this assault came to light Mr. Doe would be stripped of  every "comfort" he had in prison.

43.      The SID officers gave Mr. Doe two options: either "forget" that Defendant McElroy drugged and sexually assaulted him or be put in administrative segregation, in conditions of solitary confinement.

44.      Based on this threat from the SID officers, and his concern about facing disciplinary action, Mr. Doe complied.  When instructed by the SID officers, Mr. Doe provided a videotaped statement in which he stated that he had not been assaulted or drugged by Defendant McElroy.  A couple of hours later, Mr. Doe was moved back to his cell in general population.  The transfer of

Mr. Doe back to general population, rather than to "pre-hearing detention" in an administrative segregation unit pending the resolution of his disciplinary charges, was a deviation from DOC practice.

45.     However, Mr. Doe's time in general population was short-lived.  Approximately two hours later, a Sergeant Hernandez summoned Mr. Doe for a transfer out of the unit due to the pending disciplinary charges.  Mr. Doe informed Sergeant Hernandez that the SID officers had taken care of the disciplinary charges; Sergeant Hernandez responded that, in fact, they had not. At that time, Mr. Doe  realized that the SID officers had lied and manipulated him to protect Defendant McElroy. Thus, Mr. Doe informed Sergeant Hernandez that he wanted to make a report of a sexual assault, pursuant to PREA.  In response, Mr. Doe was placed on suicide watch, and transferred to a special suicide watch unit.

**C.     Defendants Assault Plaintiff in Retaliation for His Efforts to Report Defendant McElroy's Sexual Assault.**

46.     In the suicide watch unit, Mr. Doe was stripped of his clothing and thrown into a cell with only his underwear on. Shortly thereafter, Mr. Doe was given a thin dress to cover himself. His cell had a metal slab he was supposed to use as a bed and nothing else. Mr. Doe's cell was filthy, smelled of mildew and sewage, and was so cold that Mr. Doe shivered the entire time he was there.

47.     In this unit, Mr. Doe was in torturous conditions. He had no access to toilet paper, soap, or a tooth brush and was denied medication and food. Prison guards walked by his cell and taunted him, they called him a "faggot" and a "homo." At one point, Mr. Doe informed an officer that he had not eaten, in response the officer said in sum or substance "I do not give a fuck faggot, you can starve."

48.     Around midnight, two SID officers visited Mr. Doe but Mr. Doe refused to speak to these SID officers and demanded to speak with the original SID officers who had told him they would take care of his disciplinary charges.

49.     Mr. Doe remained in the suicide watch unit approximately 5:00 p.m. on October 4, 2021.  At that time, several officers, including Defendants Moore, Franca, Perez, and Castillo, arrived and informed Mr. Doe that he was being transferred to an administrative lock-up unit.  Mr. Doe requested to meet with SID officers, pursuant to PREA, for the purpose of again reporting his complaint against Defendant McElroy, but this time in a recorded statement.  The Defendants not only refused, but responded with homophobic slurs directed at Mr. Doe.

50.     Defendants transferred Mr. Doe with his arms handcuffed behind his back.  While they walked Mr. Doe between units, Defendants squeezed Mr. Doe's arms tightly and twisted his wrists.  Mr. Doe complained of the pain that they were causing, but Defendants did not cease.  Mr. Doe therefore refused to continue moving; instead, he sat on the floor and requested that a supervisor  be called to accompany him during the transfer and ensure that Defendants did not continue hurting him.  Defendants refused to call a supervisor, and instead told Mr. Doe that if he did not continue walking, they would injure him.

51.     Fearful for his life, Mr. Doe got off the floor and proceeded to walk further with the officers, who continued to roughly handle Mr. Doe's arms and wrists.  At one point, Mr. Doe felt a "pop" in his left hand, and it went numb.  He again asked Defendants to stop hurting him; they refused to stop and again used homophobic slurs against Mr. Doe.

52.     Due to the pain, Mr. Doe attempted to go to the ground again.  Instead, he tripped. After that, Defendants Moore, Franca, Perez, and Castillo physically assaulted Mr. Doe.  One Defendant repeatedly punched Mr. Doe in the face, and other Defendants also repeatedly punched

and kicked Mr. Doe.  Through the entire encounter, Mr. Doe was handcuffed behind his back and unable to defend himself.

53.     Other officers responded to the scene.  Eventually, an officer with a video recording device arrived, at which time the assault stopped.  As a result of having been assaulted, Mr. Doe was unable to stand, let alone walk. Mr. Doe was so badly beaten that prison staff had to place him on a stretcher to transfer him to the infirmary.

54.     Mr. Doe suffered significant physical injuries from the vicious assault: two black eyes; facial abrasions; bruises on his arms and wrists, as well as a sprained wrist; and "road rash" on his face and legs from being dragged across the concrete floors.  He remained in the infirmary for three more days, through October 7, to receive treatment for his injuries.

55.     Defendants Moore, Franca, Perez, and  Castillo all submitted reports in connection with their assault of Mr. Doe.  All four of these Defendants falsely claimed that Mr. Doe had kicked Defendant Perez in the leg prior to the assault.  Defendant Russo also submitted a report falsely claiming that he had seen Mr. Doe kick an officer prior to the assault.  Upon information and belief, none of these Defendants faced any discipline for assaulting Mr. Doe.  However, Mr. Doe was subjected to disciplinary proceedings based on the false allegation that he had kicked Defendant Perez.

56.     SID officers again visited Mr. Doe in the infirmary, including one of the SID officers who had been present for the initial visit when Mr. Doe was threatened and pressured to deny his claims on camera.  The SID officers informed Mr. Doe that it was not "too late," and the SID officers could still "fix it," which Mr. Doe understood to mean that they would get his disciplinary charges dropped if he withdrew his claims that Defendant McElroy had drugged and sexually assaulted him.  However, Mr. Doe stood firm and insisted on filing a PREA complaint.

57.     After threatening Mr. Doe off-camera for nearly an hour, Mr. Doe demanded to have the camera turned on so that he could finally have his PREA complaint recorded. At this time, the SID officers turned on the camera and Mr. Doe told them that Defendant McElroy forced him into an off-camera area, drugged him, and then forced him to perform oral sex.

58.     Nonetheless, after Mr. Doe's treatment in the infirmary was completed, he was transferred to the suicide unit—in which he was held in conditions of solitary confinement—based on his pending prison disciplinary charges, all arising out of the false reports that he had kicked Defendant Perez and had been intoxicated.  In fact, Mr. Doe's disciplinary charges in fact directly resulted from Mr. Doe's report of Defendant  McElroy's sexual abuse.

## D.     Defendants Place Plaintiff in Isolation in Retaliation for His Efforts to Report Defendant McElroy's Sexual Assault.

59.     Mr. Doe was found guilty of the assault and drug charges and given a disciplinary sanction of 365 days, or one year, in administrative segregation. Mr. Doe filed an administrative appeal and subsequently Defendant Nogan, through his designee, reduced Mr. Doe's administrative segregation time from 365 days to 181 days.

60.     Under DOC regulations, N.J.A.C. 10A:4-11.4,  Defendant Nogan had "the option to request a total or partial reinvestigation of the charge or proceeding of the hearing." Upon information and belief, no such request was made and no further investigation was conducted.

61.     From approximately October 7, 2019, when he was placed in disciplinary segregation, through November 4, 2020,[5]  Mr. Doe was subject to prolonged solitary confinement.[6]

---

[5] Mr. Doe's 181-day disciplinary sanction ended on or about April 20, 2020; however, he remained in the same unit, in conditions of solitary confinement, until he was released from prison in November 2020. Prison officials claimed that Mr. Doe's continued detention was for his own safety.

[6] "Isolated confinement means confinement of an inmate in a correctional facility, pursuant to

He was isolated to his cell for almost 24 hours a day on average, and well more than 20 hours a day, in retaliation for having asserted his right to be free from sexual assault.

62.     In administrative segregation, Mr. Doe was kept in a small cell with only a mattress. His cell was cold and smelled of mildew and must. Rodents and insects were everywhere.  He was not fed consistently and his requests for meals were often ignored. The only human interactions Mr. Doe had were with guards who walked by his cell and berated him with homophobic slurs.

63.     "It is well established in both case law and scientific and medical research that [] solitary confinement…poses a substantial risk of serious psychological and physical harm[.]" *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020); *see also Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017).

64.     Indeed, in response to serious concerns regarding the use of solitary confinement, on June 20, 2019, the New Jersey Senate and Assembly passed the Assembly Bill A314, Isolated Confinement Restriction Act, which would have made Mr. Doe's 181 day administrative segregation sanction illegal. And on July 11, 2019 Governor Murphy signed the bill into law, restricting DOC's ability to use solitary confinement, effective as of August 1, 2020.  *See* Catherine Kim, *Solitary confinement isn't effective. That's why New Jersey passed a law to restrict it*, Vox (July   11,   2019),   https://www.vox.com/policy-and-politics/2019/7/10/20681343/solitary-confinement-new-jersey.

65.     The Isolated Confinement Restriction Act drastically restricts solitary confinement to a maximum of "20 consecutive days, or for more than 30 days during any 60-day period." N.J.S.A. 30:4-82.8. In addition, with narrow exceptions that do not apply to Mr. Doe, the Act

---

disciplinary, administrative, protective, investigative, medical, or other classification, in a cell or similarly confined holding or living space, alone or with other inmates, for approximately 20 hours or more per day in a State correctional facility." N.J.S.A. 30:4-82.7

prohibits the use of isolated confinement on vulnerable populations, which includes people who are "perceived to be lesbian, gay, bisexual, transgender, or intersex." N.J.S.A. 30:4-82.7.

66.     Defendants kept Mr. Doe, a gay man, in conditions of solitary confinement for over a year as disciplinary punishment for reporting Defendant McElroy's sexual abuse.

67.     Mr. Doe's experience in isolation— separately and together with the fact that he was still recovering from injuries sustained during Defendants' sexual and physical assaults and knew he was charged as pretext and retaliation— caused him pain, suffering, emotional distress, fear, anguish, and humiliation.

**E**.     **DOC Relies on Mr. Doe in Defendant McElroy's Termination Hearing**

68.     While Mr. Doe was serving his administrative segregation sentence in retaliation for reporting Defendant McElroy's sexual abuse, the DOC terminated Defendant McElroy's employment based upon Mr. Doe's allegations and a subsequent investigation.

69.      Defendant McElroy is currently challenging his termination in an administrative proceeding before the New Jersey Office of Administrative Law.

70.     Despite disciplining Mr. Doe for reporting Defendant McElroy's sexual abuse, the DOC sought Mr. Doe's assistance in Defendant McElroy's termination proceeding. Mr. Doe agreed and in January 2021 testified in those proceedings regarding Defendant McElroy's drugging and assault. At the hearing DOC relied on Mr. Doe's testimony as proof of the need for Defendant McElroy's termination.

71.     By soliciting Mr. Doe's testimony under oath, the DOC, through its counsel at the New Jersey Attorney General's Office, indicated its belief in Mr. Doe's claims. *See* N.J. Rules of Prof'l Conduct 3.3.(a)(4) ("A lawyer shall not knowingly: . . . offer evidence that the lawyer knows to be false.").

72.     Upon information and belief, the administrative proceedings are still pending a decision from the Administrative Law Judge.

**F.      Plaintiff Suffers from Ongoing Psychological Harm Resulting from Both the Sexual Assault and the Retaliatory Assault.**

73.     Mr. Doe was released from incarceration on November 4, 2020.  Since then, he has been undergoing psychological treatment, including counseling and medication, as a result of the assaults described above.

74.     More specifically, Mr. Doe suffers from a range of anxiety and depressive disorders, including bipolar disorder.  He suffers from flashbacks and nightmares related to the sexual and physical assaults he suffered while imprisoned.  He also experiences depression and has difficulty sleeping.  He is anxious and easily irritable.  These symptoms have at times prevented Mr. Doe from forming and maintaining lasting relationships with his family, friends, and romantic partners.

75.     One example of Mr. Doe's anxiety and flashbacks relates to the sound of keys jingling on a keychain.  That sound is a repeated aspect of life inside a prison, because prison guards must carry numerous keys in order to carry out their duties; it was one of the only consistent noises Mr. Doe heard while in administrative segregation.  Mr. Doe now associates the sound of keys jingling with the trauma that he suffered while  in isolation.  Mr. Doe therefore only carries a single key on his keychain in order to avoid hearing that sound.

76.     Mr. Doe attends frequent medical appointments, both in person and over the phone, and sometimes multiple times per week, in order to manage the psychological harm of his sexual assault and related time in solitary confinement.  He takes numerous medications and participates in intensive counseling and therapy sessions.

77.     Only with the support of this extensive treatment has Mr. Doe been able to piece his life back together, working multiple jobs and obtaining independent housing.  As noted above, his psychological disorders limit his ability to form lasting relationships, so Mr. Doe lives as independently as he can.  But he also lives with the constant worry that because of the trauma he suffered due to the sexual and physical assaults described in this Complaint, his psychological state will deteriorate and he will lose the gains he has made so far.

**E.     The Harm Plaintiff Suffered Resulted from Defendants Hicks and Nogan's Failure to Train and Supervise the Other Defendants.**

78.     Mr. Doe's case is unfortunately not atypical: there are numerous examples of prisoners who are sexually and physically abused by the prison guards who are required to protect them from harm, a matter which can be attributed to the the failure of the top levels of DOC leadership to train and its employees.

79.     Indeed, sexual and physical assault has long been a frequent occurrence at the Edna Mahan Correctional Facility for Women, another DOC facility.  In January 2017, the Newark Star-Ledger published an extensive story regarding sexual abuse allegations at Edna Mahan, dating back as far as 2008.  *See* S.P. Sullivan, *Locked Up, Fighting Back*, THE STAR-LEDGER (NEWARK), Jan. 29, 2017, https://www.nj.com/news/page/locked_up.html.  The story focused on Officer Erick Melgar, who was accused by more than a dozen prisoners of committing acts of physical and sexual abuse.  *Id.*  Melgar was never criminally charged, but agreed to pay $75,000 to settle a lawsuit filed by six women that he had abused.  *See* S.P. Sullivan, *N.J. corrections officer accused of sex abuse at women's prison to pay inmates $75K*, N.J. ADVANCE MEDIA, Mar. 22, 2017, https://www.nj.com/news/2017/03/nj_corrections_officer_accused_of_sex_abuse_to_pay.html; *see also T.A. v. Melgar*, Docket No. A-3730-16T2, 2018 WL 3468167 (App. Div. July 19, 2018)

(reversing summary judgment in favor of Melgar's supervisors and remanding for further proceedings).

80. Additional investigations and litigation followed. In May 2018, Edna Mahan Corrections Officer Jason Mays was convicted of five criminal counts related to sexual assaults he committed against prisoners there, and he was sentenced to sixteen years in prison. *See* S.P. Sullivan, *N.J. women's prison officer gets 16-year sentence for sexually assaulting inmates*, N.J. ADVANCE MEDIA, July 26, 2018, https://www.nj.com/news/2018/07/womens_prison_officer_gets_16-year_sentence_for_se.html. This came among a flurry of other criminal charges against officers, as well as civil lawsuits and a civil rights investigation led by the United States Department of Justice. *See* S.P. Sullivan, *This is how sex abuse at N.J.'s women's prison goes undetected*, N.J. ADVANCE MEDIA, May 16, 2018, https://www.nj.com/politics/2018/05/this_is_how_sex_abuse_at_njs_womens_prison_goes_un.html; S.P. Sullivan, *Sex abuse scandal at N.J. women's prison keeps getting worse*, N.J. ADVANCE MEDIA, July 13, 2018, https://www.nj.com/politics/2018/07/sex_abuse_scandal_at_nj_womens_has_sparked_at_leas.html. At that time, the Commissioner of Corrections, Gary Lanigan, retired under pressure related to the Edna Mahan investigations, which resulted in Defendant Hicks—the then-chief of staff for the DOC—becoming the new Commissioner. *See* S.P. Sullivan, *N.J. corrections commissioner retiring amid questions over sex abuse scandal at women's prison*, N.J. ADVANCE MEDIA, May 2, 2018, https://www.nj.com/politics/2018/05/nj_corrections_commissioner_retires_after_murphy_a.html.

81.     Under Defendant's Hicks's tenure as Commissioner, multiple investigations of Edna Mahan continued.  The federal civil rights investigation resulted in a notice, issued in April 2020, pursuant to the Civil Rights of Institutionalized Persons Act, in which the DOJ concluded that the DOC "fails to keep prisoners at Edna Mahan safe from sexual abuse by staff," and "[d]espite being on notice of this sexual abuse, []DOC and Edna Mahan failed to take timely action to remedy the systemic problems that enabled correction officers and other staff to continue to sexually abuse Edna Mahan prisoners."  Dep't of Justice, *Investigation of the Edna Mahan Correctional Facility for Women (Union Township, New Jersey)* 1 (April 2020), https://www.justice.gov/opa/press-release/file/1268391/download.  In August 2021, the DOJ filed a Complaint and proposed consent decree requiring significant reforms to the DOC's operations at Edna Mahan or any replacement facility.  *See* Press Release, Dep't of Justice, *Justice Department Reaches Proposed Consent Decree with New Jersey to Resolve Claims that Edna Mahan Correctional Facility for Women Violated Constitution by Failing to Protect Prisoners from Sexual Abuse by Staff* (Aug. 10, 2021), https://www.justice.gov/usao-nj/pr/justice-department-reaches-proposed-consent-decree-new-jersey-resolve-claims-edna-mahan.

82.     Meanwhile, in addition to these allegations of sexual abuse, other significant claims regarding physical abuse that occurred under Defendant Hicks's watch also came to light.  In January 2021, the media reported that Edna Mahan corrections officers had been "accused of severely beating several women [prisoners]" on January 11, "including one [prisoner] who now has a broken eye socket and a transgender woman beaten so badly she cannot walk and is now in a wheelchair."  Blake Nelson & Joe Atmonavage, *Dozens suspended at N.J. prison after officers are accused of beating women prisoners*, N.J. Advance Media, Jan. 25, 2021, https://www.nj.com/news/2021/01/dozens-suspended-at-nj-prison-after-officers-are-accused-of-

beating-women-prisoners.html.  In response, Governor Murphy directed the hiring of independent outside counsel, Lowenstein Sandler LLP, to investigate.  *See* Stacey Barchenger, *Phil Murphy orders another investigation of abuse at NJ women's prison*, NorthJersey.com, Jan. 27, 2021, https://www.northjersey.com/story/news/2021/01/27/gov-murphy-investigation-abuse-prison-edna-mahan/4282528001/.

83.     In a report dated June 3 and released to the public on June 7, Lowenstein Sandler identified numerous failures in connection with the above-referenced January 11 actions, including a failure to follow proper procedures regarding cell extractions; failure to properly record those extractions; use of excessive force; and filing of false reports.  *See* Lowenstein Sandler LLP, *Report of Investigation: January 11, 2021 Cell Extractions at the Edna Mahan Correctional Facility for Women* 50-56 (June 3, 2021), https://s3.documentcloud.org/documents/20798925/edn-mahan-report_of_investigation.pdf.  The report also concluded that the protocols governing cell extractions were unclear and contradictory, resulting in "inconsistent understandings" of the proper procedures, including conflicts between the written policies and Defendant Hicks's public testimony regarding the procedures.  *Id.* at 58-59.  In fact, Defendant Hicks, despite being Commissioner at the time, appeared confused about who was in charge at the Edna Mahan facility: he suggested that Erica Stern had been appointed as the Acting Administrator, but Stern and others indicated that she was an Associate Administrator, a subordinate position.  *Id.* at 25-26.  Finally, the report identified failures to implement necessary remedial measures, including delays in implementing both an "early warning system" that would proactively identify corrections officers who were engaged in wrongful conduct and a failure to require use of body warn cameras during the incidents.  *Id.* at 60-62.

84.     The Lowenstein Sandler report found particularly troubling that significant misconduct occurred out in the open.  As the report notes, sexual misconduct of the type previously alleged at Edna Mahan "occurred secretly and in hiding," but the January 11 cell extractions "happened in the open, in the presence of numerous people and multiple video cameras, revealing the significance of the challenges that remain at the facility."  *Id.* at 62.

85.     As a result of the Lowenstein Sandler investigation, Governor Murphy announced his intent to close the Edna Mahan facility.  *See* Ted Sherman, et al., *In stunning move, Murphy to close scandal-ridden Edna Mahan state prison for women*, N.J. Advance Media, June 7, 2021, https://www.nj.com/politics/2021/06/in-stunning-move-murphy-to-close-scandal-ridden-edna-mahan-state-prison-for-women.html.

86.     Further, a grand jury indicted two South Woods State Prison, a DOC facility, corrections officers for their unwarranted use of force against an prisoner. Matt Gray, *Corrections officers indicated in assault on N.J. state prison inmate captured on video*, N.J. com (September 1, 2021), https://www.nj.com/cumberland/2021/08/corrections-officers-indicted-in-assault-on-nj-state-prison-inmate-captured-on-video.html.  This assault, like the others, occurred under Defendant Hicks' leadership and was captured on video. One of the officers admitted to "entering the victim's cell without official purpose and assaulting him" and the other watched the assault happen, did nothing to stop it, and then failed to report it. *Id.*

87.     Defendant Hicks, facing numerous calls to resign and a potential impeachment, announced on June 8 that he would step down as Commissioner.  Matt Arco & Blake Nelson, *Top N.J. prison official quits after widespread abuse exposed*, NJ Advance Media, June 8, 2021, https://www.nj.com/politics/2021/06/nj-corrections-commissioner-is-out-after-damning-report-on-abuse-at-state-womens-prison.html.

88.     Separately, with respect to Northern State Prison, where Mr. Doe was assaulted, and where Defendant Administrator Nogan has, upon information and belief, held his position since March 2019, at least two public instances of corrections officers committing sexual misconduct against prisoners have become public over the past two years.[7]

89.     First, in December 2018, Corrections Officer Avril Richardson was arrested and charged with second-degree sexual assault for having a sexual relationship with a prisoner while she was employed at Northern State Prison.  *See* Taylor Tiamoyo Harris, *Corrections officer arrested, charged with having sexual relationship with prisoner*, N.J. ADVANCE MEDIA, Dec. 14, 2018, https://www.nj.com/essex/2018/12/corrections-officer-arrested-charged-with-having-sexual-relationship-with-prisoner.html.  Before she was arrested, Officer Richardson had been engaged in the unlawful relationship since 2016.  *Id.*  She later pleaded guilty to a fourth-degree charge of criminal sexual contact, was sentenced to three years of probation, and was prohibited from holding public employment in the future.  *See* Joe Brandt, *N.J. corrections officer who had sexual relationship with inmate sentenced to probation*, N.J. Advance Media, Aug. 30, 2019, https://www.nj.com/essex/2019/08/nj-corrections-officer-who-had-sexual-relationship-with-prisoner-sentenced-to-probation.html.

90.     A second instance of sexual misconduct at Northern State Prison became public in December 2020, when Senior Correctional Police Officer Tasheena Majors was charged with second-degree sexual assault against a prisoner during her employment at the facility.  *See* Noah Cohen, *N.J. corrections officer accused of sex with prisoner, state says*, Dec. 22, 2020,

---

[7] Plaintiff's ability to access information regarding other allegations of this type of misconduct is limited because New Jersey sharply restricts public access to the internal affairs files of law enforcement agencies, including the DOC.  *See Is Police Misconduct a Secret in Your State?*, WHYY, https://project.wnyc.org/disciplinary-records/ (listing New Jersey as one state in which "a police officer's disciplinary record is mostly unavailable through public records requests").

https://www.nj.com/essex/2020/12/nj-corrections-officer-accused-of-sex-with-prisoner-state-says.html.  The Attorney General's Office alleged that Officer Majors had engaged in sexual intercourse with a male prisoner for a thirteen-month period from November 2019 to December 2020.  *Id.*  Upon information and belief, those charges remain pending.

91.     Furthermore, in the 2019 PREA audit of Northern State Prison, the facility "reported 40 sexual abuse/ harassment allegations for the audit period, with 16 cases closed at the time of the audit. Northern State Prison reported two substantiated cases, 12 unsubstantiated cases, and two unfounded cases." However, "at the time of the on-site-audit, 24 sexual abuse/harassment cases were pending review," that is, they had yet to be reviewed by DOC.  Prison Rape Elimination Act Audit Report, Northern State Prison, pg. 11 (July 31, 2019), https://www.nj.gov/corrections/pdf/PREA/2019/Final%20PREA%20Audit%20Report%20-%20NJ%20DOC%20Northern%20State%20Prison.pdf. While shocking given Northern State Prison's staff failure adhere to the most basic PREA requirements in Mr. Doe's case, the amount of sexual assaults at the facility are not surprising.

92.     PREA requires DOC to "provide multiple internal ways for inmates to privately report sexual abuse and sexual harassment [and] retaliation by other inmates or staff for reporting sexual abuse and sexual harassment…." 28 C.F.R. § 115.51.  Furthermore, DOC staff must "accept reports made verbally, in writing, anonymously, and from third parties and shall promptly document any verbal reports." *Id.*

93.     At least four different Norther State Prison staff members knew of Mr. Doe's sexual assault and failed to abide by PREA's reporting requirement, which is in place to protect prisoners like Mr. Doe who have been sexually assaulted while in prison.

94.     Mr. Doe's initial report of Defendant McElroy's sexual assault was never documented by the medical employee. The SID officers who first interviewed Mr. Doe violated PREA's requirements by failing to document his complaint and intimidating him into recanting his claim.  Similarly, the second set of SID officers who interviewed Mr. Doe failed to document Mr. Doe's PREA report for hours in an attempt to intimidate Mr. Doe into recanting his claim.

95.     Moreover, pursuant to PREA, "[f]or at least 90 days following a report of sexual abuse, the agency shall monitor the conduct and treatment of inmates or staff who reported the sexual abuse and of inmates who were reported to have suffered sexual abuse to see if there are changes that may suggest possible retaliation by inmates or staff, and shall act promptly to remedy any such retaliation. Items the agency should monitor include any inmate disciplinary reports, housing, or program changes, or negative performance reviews or reassignments of staff." 28 C.F.R. § 115.67.

96.     On information and belief Defendants failed to monitor Mr. Doe's case following his PREA report. Indeed, if any such monitoring had occurred Defendants would have discovered that Mr. Doe had in fact been physically assaulted by prison guards and placed in administrative segregation, in conditions of solitary confinement, in retaliation for reporting Defendant McElroy's sexual abuse.

97.     Furthermore, Defendants were aware of issues arising from retaliation against prisoners making PREA complaints at Northern State Prison well before Defendant McElroy sexually assaulted Mr. Doe. In fact, during the 2019 the Northern State Prison PREA audit, auditors recommended that DOC update its PREA policies to cover issues concerning "the disciplining of inmates who make an allegation in good faith, even if an investigation does not establish evidence sufficient to substantial the allegation[.]" Prison Rape Elimination Act Audit

Report, Northern State Prison, pg. 89 (July 31, 2019),
https://www.nj.gov/corrections/pdf/PREA/2019/Final%20PREA%20Audit%20Report%20-
%20NJ%20DOC%20Northern%20State%20Prison.pdf.

98.     On information and belief, Defendants failed to address the disciplinary issues
within the facility and as a result, Mr. Doe spent over a year in administrative segregation, in
conditions of solitary confinement for reporting Defendant McElroy's sexual abuse.

99.     These examples, which represent only publicly available materials that are the tip
of the iceberg of the sexual misconduct committed by DOC staff at Northern State Prison and in
other facilities, evidence the failure of senior DOC leadership, including Defendants Hicks and
Nogan, to train and supervise DOC employees regarding sexual misconduct of the type that
Defendant McElroy committed against Mr. Doe.

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – Eighth Amendment
Sexual Abuse
(Against the Defendant McElroy)

100.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set
forth at length herein.

101.    Federal law, 42 U.S.C. § 1983, provides that "[e]very person who, under color of
any statute, ordinance, regulation, custom, or usage, of any State  . . ., subjects, or causes to be
subjected, any citizen of the United States or other person within the jurisdiction thereof to the
deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be
liable to the party injured in an action at law, suit in equity, or other proper proceeding for
redress[.]"

102.    The Eighth Amendment to the Constitution of the United States protects
individuals, including Plaintiff, from sexual abuse. *See Ricks v. Shover*, 891 F.3d 468, 473 (3d

Cir. 2018) ("Sexual abuse invades the most basic of dignity interests: to be treated as a human being.  We condemn such abuse as it is simply not part of the penalty that criminal offenders pay for their offenses against society." (internal quotation marks omitted)).

103.    Defendant McElroy committed sexual abuse against Plaintiff, as alleged herein. Defendant McElroy's sexual abuse of Plaintiff was objectively serious and harmful in violation of the Eighth Amendment.

104.    Defendant McElroy's sexual abuse of Plaintiff was committed with a subjectively culpable state of mind, and lacked any legitimate law enforcement or penological purpose, in violation of the Eighth Amendment.

105.    At all relevant times, Defendant McElroy was acting under color of state law, in his capacity as a corrections officer.

106.    As a direct and proximate result of Defendant McElroy's sexual abuse detailed above, Plaintiff sustained the damages alleged herein.

**SECOND CAUSE OF ACTION**
42 U.S.C. § 1983 – Eighth Amendment
Excessive Force
(Against Defendants Moore, Franca, Perez, and Castillo)

107.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

108.    Federal law, 42 U.S.C. § 1983, provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State  . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

109.    The Eighth Amendment to the Constitution of the United States prohibits the use of excessive force against an prisoner.  *See, e.g.*, *Smith v. Mensinger*, 293 F.3d 641, 647 (3d Cir. 2002).

110.    Defendants Moore, Franca, Perez, and Castillo used excessive force against Plaintiff, as alleged herein.  Defendants Moore, Franca, Perez, and Castillo's use of force was not "applied in a good-faith effort to maintain or restore discipline," but rather was committed "maliciously and sadistically to cause harm."  *Id.* at 649.

111.    Defendants Moore, Franca, Perez, and Castillo's use of excessive force was objectively unreasonable in that it caused harm that was "more than *de minimis*."  *Fuentes v. Wagner*, 206 F.3d 335, 345 (3d Cir. 2000).

112.    At all relevant times, Defendants Moore, Franca, Perez, and Castillo were acting under color of state law, in their capacity as corrections officers.

113.    As a direct and proximate result of Defendants Moore, Franca, Perez, and Castillo's excessive force detailed above, Plaintiff sustained the damages alleged herein.

## THIRD CAUSE OF ACTION
42 U.S.C. § 1983 – First Amendment
Retaliation
(Against Defendants Moore, Franca, Perez, and Castillo)

114.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

115.    Federal law, 42 U.S.C. § 1983, provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State  . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be

liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

116.    Plaintiff had the right under the First Amendment to the Constitution of the United States to make an oral grievance regarding Defendant McElroy's sexual abuse.  *See Mack v. Warden Loretto FCI*, 839 F.3d 286, 297-299 (3d Cir. 2016).

117.    Defendants Moore, Franca, Perez, and Castillo committed a physical assault in retaliation for Plaintiff's exercise of his First Amendment rights. *See Grant v. Delarosa*, Civ .A. 14-3358 ES, 2015 WL 5227475, at *4 (D.N.J. Sept. 4, 2015) ("Retaliation against a prisoner based on his exercise of a constitutional right violates the First Amendment.") (citing Bistrian v. Levi, 696 F.3d 352, 376 (3d Cir.2012)).

118.    At all relevant times, Defendants Moore, Franca, Perez, and Castillo were acting under color of state law, in their capacity as corrections officers.

119.    As a direct and proximate result of Defendants Moore, Franca, Perez, and Castillo's unconstitutional retaliation detailed above, Plaintiff sustained the damages alleged herein.

**FOURTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Eighth Amendment
Failure to Protect
(Against the Defendant Lieutenant Russo)

120.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

121.    Federal law, 42 U.S.C. § 1983, provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State  . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be

liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

122.     A corrections officer's failure to intervene in an assault against a prisoner violates the Eighth Amendment to the Constitution of the United States.  *Smith*, 293 F.3d at 650 ("We hold that a corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so.").

123.     Defendant Russo failed to protect Plaintiff from the assault committed by Defendants Moore, Franca, Perez, and Castillo, as alleged herein.

124.     At all relevant times, Defendant Russo was acting under color of state law, in his capacity as a corrections officer.

125.     As a direct and proximate result of Defendant Russo's failure to protect Plaintiff detailed above, Plaintiff sustained the damages alleged herein.

## **FIFTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Eighth Amendment
Failure to Supervise
(Against Defendants Hicks and Nogan)

126.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

127.     Federal law, 42 U.S.C. § 1983, provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State  . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

128.    Supervisory prison officials are liable for acts committed by their subordinates "if they, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'"  *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017) (alteration in original) (quoting *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)).

129.    At all relevant times, Defendants Hicks and Nogan created policies, practices, and/or customs which caused the sexual abuse, excessive force, and/or retaliatory conduct against Plaintiff, with deliberate indifference to the harm that Plaintiff suffered.

130.    At all relevant times, Defendants Hicks and Nogan were acting under color of state law, in their capacities as DOC officials.

131.    As a direct and proximate result of Defendants Hicks and Nogan's failure to supervise detailed above, Plaintiff sustained the damages alleged herein.

**SIXTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Eighth Amendment
Failure to Train
(Against Defendants Hicks and Nogan)

132.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

133.    Federal law, 42 U.S.C. § 1983, provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State  . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

134.    Supervisory prison officials are liable for failure to train their subordinates, where the failure to train "has a causal nexus with" Plaintiff's injury and "the failure to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur." *Palakovic v. Wetzel*, 854 F.3d 209, 233 (3d Cir. 2017).

135.    At all relevant times, Defendants Hicks and Nogan failed to provide appropriate training which caused the sexual abuse, excessive force, and/or retaliatory conduct against Plaintiff, with deliberate indifference to the harm that Plaintiff suffered.

136.    At all relevant times, Defendants Hicks and Nogan were acting under color of state law, in their capacities as DOC officials.

137.    As a direct and proximate result of Defendants Hicks and Nogan's failure to train detailed above, Plaintiff sustained the damages alleged herein.

### SEVENTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment
Equal Protection
(Against Defendants Hicks and Nogan)

138.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

139.    Federal law, 42 U.S.C. § 1983, provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State  . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

140.    The Fourteenth Amendment's Equal Protection Clause provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United

States… nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

141.    The Fourteenth Amendment protects individuals, like Mr. Doe, from discrimination based upon sexual orientation. *See Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1137 (9th Cir. 2003) ("State employees who treat individuals differently on the basis of their sexual orientation violate the constitutional guarantee of equal protection.").

142.    Defendants Hicks and Nogan,  acting under color of a state law, condoned, ratified, and perpetuated actions that discriminated against Mr. Doe on the bases of his sexual orientation in violation of the Fourteenth Amendment, including without limitation by sexually assaulting him because of his sexual orientation,  harassing him with homophobic slurs,  and by otherwise treating Mr. Doe differently from other men in their custody.

143.    Defendants Hicks and Nogan's actions as described herein were taken without an important or legitimate governmental interest or rational reasons, and they had  no penological basis to discriminate against Mr. Doe based upon his sexual orientation.

144.    As a direct and proximate result of Defendants Hicks and Nogan's discrimination detailed above, Plaintiff sustained the damages alleged herein.

**EIGHTH CAUSE OF ACTION**
N.J.S.A. 10:6-2(c) - Violations of New Jersey Constitution, Article I, Paragraph 1 and 12
Sexual Abuse
(Against the Defendant McElroy)

145.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

146.    The New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c), provides that "[a]ny person who has been deprived of . . . any substantive rights, privileges or immunities secured by the

Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief."

147.     Article I, Paragraph 1 of the New Jersey Constitution guarantees to "all persons . . . certain natural an unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." Under Article I, Paragraph 12, "cruel and unusual punishments shall not be inflicted."

148.     For the reasons set forth above in the First Cause of Action, Defendant McElroy's conduct also violates the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

**NINTH CAUSE OF ACTION**

N.J.S.A. 10:6-2(c) - Violations of New Jersey Constitution, Article I, Paragraph 1 and 12
Excessive Force
(Against Defendants Moore, Franca, Perez, and Castillo)

149.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

150.     The New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c), provides that "[a]ny person who has been deprived of . . . any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief."

151.     Article I, Paragraph 1 of the New Jersey Constitution guarantees to "all persons . . . certain natural an unalienable rights, among which are those of enjoying and defending life and

liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." Under Article I, Paragraph 12, "cruel and unusual punishments shall not be inflicted."

152.    For the reasons set forth above in the Second Cause of Action, Defendants Moore, Franca, Perez, and Castillo's conduct also violates the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

**TENTH CAUSE OF ACTION**
N.J.S.A. 10:6-2(c) - Violations of New Jersey Constitution, Article I, Paragraph 1 and 18
Retaliation
(Against Defendants Moore, Franca, Perez, and Castillo)

153.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

154.    The New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c), provides that "[a]ny person who has been deprived of . . . any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief."

155.    Article I, Paragraph 1 of the New Jersey Constitution guarantees to "all persons . . . certain natural an unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." Under Article I, Paragraph 18, "[t]he people have the right freely to assemble together, to consult for the common good, to make known their opinions to their representatives, and to petition for redress of grievances."

156.    For the reasons set forth above in the Third Cause of Action, Defendants Moore, Franca, Perez, and Castillo's conduct also violates the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

## ELEVENTH CAUSE OF ACTION
N.J.S.A. 10:6-2(c) - Violations of New Jersey Constitution, Article I, Paragraph 1 and 12
Failure to Intervene
(Against Defendant Russo)

157.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

158.    The New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c), provides that "[a]ny person who has been deprived of . . . any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief."

159.    Article I, Paragraph 1 of the New Jersey Constitution guarantees to "all persons . . . certain natural an unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."  Under Article I, Paragraph 12, "cruel and unusual punishments shall not be inflicted."

160.    For the reasons set forth above in the Fourth Cause of Action, Defendant Russo's conduct also violates the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

## TWELFTH CAUSE OF ACTION
N.J.S.A. 10:6-2(c) - Violations of New Jersey Constitution, Article I, Paragraph 1 and 12
Failure to Supervise
(Against Defendants Hicks and Nogan)

161.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

162.    The New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c), provides that "[a]ny person who has been deprived of . . . any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief."

163.    Article I, Paragraph 1 of the New Jersey Constitution guarantees to "all persons . . . certain natural an unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."  Under Article I, Paragraph 12, "cruel and unusual punishments shall not be inflicted."

164.    For the reasons set forth above in the Fifth Cause of Action, Defendants Hicks and Nogan's conduct also violates the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

## THIRTEENTH CAUSE OF ACTION
N.J.S.A. 10:6-2(c) - Violations of New Jersey Constitution, Article I, Paragraph 1 and 12
Failure to Train
(Against Defendants Hicks and Nogan)

165.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

166.    The New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c), provides that "[a]ny person who has been deprived of . . . any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights,

privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief."

167.    Article I, Paragraph 1 of the New Jersey Constitution guarantees to "all persons . . . certain natural an unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."  Under Article I, Paragraph 12, "cruel and unusual punishments shall not be inflicted."

168.    For the reasons set forth above in the Sixth Cause of Action, Defendants Hicks and Nogan's conduct also violates the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

**FOURTEENTH CAUSE OF ACTION**
N.J.S.A. 10:5-4 - Violations of the Law Against Discrimination
(Against Defendants Hicks and Nogan)

169.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

170.    The New Jersey Law Against Discrimination N.J.S.A. 10:5-4 provides that "[a]ll persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, liability for service in the Armed Forces of the United States, nationality, sex, gender identity or expression or source of lawful income used for rental or mortgage payments, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.

171.    DOC facilities, including Northern State Prison, constitute a place of public accomodation within the meaning of the Law Against Discrimination. See, e.g., Brown v. N.J. Dep't Corr., MER-L-00503-18, Order Granting Pl.'s Mot. Partial Summary Judgment (July 6, 2018) (holding that "the Edna Mahan Correctional Facility for Women ('EMCFW') is hereby declared a place of public accommodation pursuant to the Law Against Discrimination ('LAD')").

172.    Defendants participated in, condoned, ratified, perpetuated, aided and abetted direct actions that discriminated against Mr. Doe on the bases of his sex in places of public accomodation in violation of the Law Against Discrimination, including without limitation by sexually assaulting him because of his sexual orientation,  harassing him with homophobic slurs,  and by otherwise treating Mr. Doe differently from other men in their custody.

173.    Defendants created an environment for Mr. Doe that was discriminatory based on sex, and the harassment and discrimination was so severe and pervasive that it constituted a hostile and abusive environment in violation of the Law Against Discrimination.

174.    Defendants' actors or omissions were motivated by actual malice or accompanied by a wanton and willful disregard of individuals who foreseeably might be harmed by those acts or omissions.

175.    As a direct and proximal result of Defendants' actions, Mr. Doe suffered extensive injury and is entitled to damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

   a.   compensatory damages against all Defendants in an amount to be determined at trial;
   b.   punitive damages against all Defendants in an amount to be determined at trial;
   c.   reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and N.J.S.A. 10:6-2; and
   d.   such other and further relief as this Court may deem just and proper.

## TRIAL BY JURY DEMANDED

Plaintiff John Doe demands a trial by jury on all matters so triable.

Dated: October 1, 2021                    Respectfully submitted,

                                          GIBBONS P.C.

                                          By: s/ Lawrence S. Lustberg
                                          Lawrence S. Lustberg, Esq.
                                          Brittany M. Thomas, Esq.
                                          One Gateway Center
                                          Newark, NJ 07102
                                          (973) 596-4500
                                          llustberg@gibbonslaw.com